## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Alex Ugorets and Elena Ugorets, | Civ. No. 21-1446 (JWB/ECW) |
| Plaintiffs, | |
| v. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| City of Shorewood, | |
| Defendant. | |

Boris Parker, Esq., and Jordan W. Anderson, Esq., Parker & Wenner, P.A., counsel for Plaintiffs.

Jessica E. Schwie, Esq., and Joshua Phillip Devaney, Esq., Kennedy & Graven, Chartered, counsel for Defendant.

This Fifth Amendment takings dispute presents cross-motions for summary judgment. (Doc. Nos. 38, 43.) Plaintiffs Alex and Elena Ugorets seek redress from Defendant City of Shorewood for blocking public street access to the rear of their residential property. Shorewood contends that the Ugorets never had a right to the access and that the City was entitled to block access if it so chose. The central questions are whether the Ugorets (who are not Shorewood residents) have a right to access the rear of their property via an abutting street indisputably located in Shorewood, whether the City's blocking of that access amounts to an unconstitutional taking, and whether the Ugorets have established their right to a remedy.

## BACKGROUND

In his 1914 poem "Mending Wall," poet laureate Robert Frost gave us a now well-

worn aphorism: "Good fences make good neighbors." This dispute may prove him wrong.

Meet Alex and Elena Ugorets, who live on a unique property near Lake Minnetonka in Minnesota. Their lot lies entirely on the Brentwood Plat within the City of Tonka Bay. The front of their house faces north, where a paved driveway connects to Brentwood Avenue. The rear of their L-shaped property sits at a lower elevation and extends east until it reaches the western edge of a street called Timber Lane. Timber Lane is a public street that lies entirely on the Timber Lane Plat within the City of Shorewood.

The scene of the present dispute is where the eastern edge of the Ugorets property (outlined in red below) meets the western edge of the Timber Lane right of way (outlined in green). Those property lines also mark the borderline separating Tonka Bay from Shorewood (outlined in yellow). Within the Timber Lane right of way area, Timber Lane's paved surface lies 30 feet east of the Ugorets property line, across a stretch of grassy turf.



(Doc. No. 41-1 at 313 (coloration added).)

The Ugorets typically accessed their property from the front, using Brentwood Avenue. The rear access off Timber Lane was for occasional use, such as the winter storage of a vehicle or boat in the backyard garage, access for contractors, or completing home improvement projects. (*See id.* at 142–44.) Leading up to the current dispute, occasional backyard access off Timber Lane had been the Ugorets' practice for 13 years, since purchasing the property and building their home on it in 2007 (including building an underground garage accessible by vehicle only from the rear of the property). (*Id.*)

Though residents of Tonka Bay, the Ugorets applied to Shorewood for an incidental use zoning permit in 2016 to protect their occasional use of the Timber Lane rear access. (*Id.* at 122, 132–33.) Shorewood's City Engineer drafted conditions under which the permit could be approved. (*Id.*) But at the Shorewood City Council meeting to consider the permit, Mr. Ugorets expressed concerns that the proposed conditions for Timber Lane access were overly restrictive. (*Id.*) Some neighbors from the Shorewood side of Timber Lane voiced opposition and concerns over the Ugorets' use of the access at all, while others understood the Ugorets' need for the access and thought a solution could be found. (*Id.* at 133–35.) Seeing no way to revise the draft conditions during the meeting, and then citing zoning and other issues, the City simply denied the application. (*Id.* at 135–36.)

This tale of two cities then grew more dramatic in July 2020. The same neighbors who had opposed the Ugorets' permit request in 2016 petitioned the City to go a step further, to physically block vehicular access to the rear of the Ugorets property along Timber Lane completely, claiming the Ugorets had begun routinely using the access. (*Id.*

at 228, 240–41.)

Before the petition was filed, one neighbor petitioner had put up a sign near the access that read "Timber Lane Guest Parking" to stop the Ugorets' purportedly wrongful use. (*Id.* at 240.) That sign disappeared. (*Id.*) In its place appeared a sign of the Ugorets' own making: "Please Do Not Block Our Driveway." (*See id.*) This dueling signage in 2020 echoed escalations over signage and access going back to 2016, when Mr. Ugorets twice had installed a pair of "no parking" signs on either side of the access point. (*Id.* at 133.) According to Mr. Ugorets, that first set of signs promptly disappeared too. (*Id.*) The replacement set fared no better, getting torn out and thrown onto his property. (*Id.*)

The escalating kerfuffle reached its peak at the August 24, 2020 Shorewood City Council meeting, where the council weighed whether to grant the neighbors' petition to block access. (*See* Doc. No. 20-7 at 15–23.) Citing various considerations, from traffic control (albeit in a cul-de-sac) to aesthetics, the City fashioned a resolution: install wooden bollards—fencing—along the west side of Timber Lane, blocking vehicular access to the Ugorets property from Timber Lane. (*Id.* at 22–23.) Bollards, pictured below, were placed at the point of access in May 2021.



4

(Doc. No. 46-2 at 13.)

The Ugorets filed suit in June 2021, asserting violation of a constitutional right of access to the rear of their property via Timber Lane. They contend that the City's actions amount to an unconstitutional taking. Shorewood responds that the Ugorets have no such right of access via Timber Lane and that it has legal rights to manage access to and off of Timber Lane. Only the Fifth Amendment claim for relief under 42 U.S.C. § 1983 remains in this matter. (*See* Doc. No. 28 at 14.) Both sides seek summary judgment.

## DISCUSSION

### I.     Legal Standard

Summary judgment is proper if the record establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party, summary judgment is inappropriate. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). On summary judgment, evidence is considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).

### II.    Analysis

The Takings Clause of the Fifth Amendment provides that private property shall not be taken for public use without just compensation and applies to the States through

the Fourteenth Amendment. U.S. Const. Amend. V; *Chicago, B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897). A Fifth Amendment taking only occurs if there is a protected property interest at issue. *See Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 507 (8th Cir. 2009). "Property interests are created and their dimensions are defined by existing rules or understandings . . . [including] relevant state law." *Id.* (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). While state law helps define what constitutes a property interest compensable under the Fifth Amendment, measuring the amount of compensation is a matter of federal law. *Cf. United States v. Mahowald*, 209 F.2d 751, 752 (8th Cir. 1954) ("What constitutes just compensation in a federal condemnation proceeding is a question of federal law."); *State of Neb. v. United States*, 164 F.2d 866, 868 (8th Cir. 1947) ("[T]he question of what is just compensation under the Fifth Amendment . . . does not turn in any manner upon the compensation standards or prescriptions of state law.").

Property can be taken in a "nearly infinite variety of ways." *Ark. Game and Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). There is no "magic formula" to determine "whether a given government interference with property is a taking" but rather should be determined on a case-by-case basis. *Id.* at 31–32 (noting that the Supreme Court "has recognized few invariable rules in this area").

One variety of taking is "inverse condemnation," for which a landowner "can recover the value of property which has been taken in fact by the governmental defendant." *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019). "[A] property owner has a Fifth Amendment entitlement to compensation as soon as the

government takes his property without paying for it." *Id.* at 2170 (citing *Jacobs v. United States*, 290 U.S. 13 (1933)). An inverse condemnation action seeks to compel the state to compensate a landowner for its interference with a private property interest. *Matter of Kuk*, No. A22-0180, 2022 WL 4682932, at *2 (Minn. App. Oct. 3, 2022) (citing *Oliver v. State ex rel. Comm'r of Transp.*, 760 N.W.2d 912, 915 (Minn. App. 2009)).

The summary judgment inquiry under a Fifth Amendment taking analysis begins with two questions: first, whether a property right exists; and second, whether the circumstances of the case amount to a taking of that right. If the answer to both questions is "yes," the next step is to consider the proper remedy.

## A.     The Ugorets Possess an Easement Right to Access Timber Lane as Abutting Landowners

The first step in analyzing whether a taking occurred is to determine whether the government interfered with a protected property interest. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984). There is no dispute that the Ugorets' backyard frontage runs along the Timber Lane right of way. The legal question under Minnesota law is what access rights belong to owners of a property that abuts a public street.

### 1.     The "center line" ownership presumption does not apply here

The parties' briefing and argument on this question mostly focused on whether the Ugorets have a property right of access to Timber Lane through "the well-understood doctrine that in case of a conveyance of a lot or block abutting on a street the purchaser is presumed to take the title to the middle of the street." *See Gilbert v. Emerson*, 61 N.W. 820, 822 (Minn. 1895). With this "center line" legal presumption, the Ugorets laid claim

and ownership to one half of the land beneath Timber Lane, to the center line of the street nearest to their property line.

Both sides argued extensively over whether the center line presumption should apply here. For instance, Shorewood argues that the presumption does not apply because the properties meet at a plat border. The Ugorets contend that the presumption ends the inquiry (because their property physically abuts the Timber Lane right of way) and establishes a legal entitlement that cannot be undone by the presence of a city or plat border. The parties' long and winding contest over the effects of plat lines, city borders, and legal presumptions has arrived at an analytical dead end: the center line presumption is inapposite and does not decide the issues in this case.[1]

When the Minnesota Supreme Court recognized the center line presumption in 1885, it explained the reason for the rule: "the adjoining owners are presumed to have originally furnished the land in equal proportions for the sole purpose of a highway." *In re Robbins*, 24 N.W. 356, 356 (Minn. 1885). The court clarified, however: "This

---

[1]     Shorewood also argues that the Ugorets are not abutting owners because their property line does not abut the *surface* of the Timber Lane roadway, even if it does abut the right of way containing Timber Lane. (*See* Doc. No. 40 at 11–12.) Shorewood cites no authority in support of this notion, and the argument plainly fails. "When determining whether property abuts the right-of-way, the relevant demarcation is the land as platted, not the land as constructed or paved." *Howell v. City of Minneapolis*, No. A12-1761, 2013 WL 1707759, at *4 (Minn. App. Apr. 22, 2013) (citing *Kooreny v. Dampier-Baird Mortuary, Inc.*, 291 N.W. 611, 612 (Minn. 1940)); *cf. State by Spannaus v. Nw. Airlines, Inc.*, 413 N.W.2d 514, 518 (Minn. App. 1987) ("An abutting owner . . . is one whose property abuts the right of way, whether or not the edge of the traveled portion of the highway is also the right-of-way line."). Shorewood admits the Ugorets property "is physically adjacent to the western edge of the platted Timber Lane" (Doc. No. 50 at 2) because as platted, Timber Lane's right of way touches the Ugorets' property line.

presumption . . . yields when a different intention is clearly manifested, or when the evidence shows there could be no foundation for it, as where the grantor at the time owned no part of the street, the same being laid wholly on the land of another." *Id.* at 357.

Modern decisions reaffirm the underlying limitation on the center line presumption, even deciding how it applies to streets located entirely within one plat, as Timber Lane is here. *See Edgewater Cottage Ass'n v. Watson*, 387 N.W.2d 216, 218 (Minn. App. 1986) ("The court in *Robbins* explains the one-half ownership rule is based on the presumption that adjoining landowners furnished land for the roadway use. However, this rule does not apply where evidence shows the street was laid out wholly on another's land."); *Petition of Bldg. D, Inc.*, 502 N.W.2d 406, 408 (Minn. App. 1993) ("When a street is located at the margin between two plats, but entirely within one plat, as here, the owners of the properties within the plat and abutting the street own the entire street.") (citing *Edgewater*, 387 N.W.2d at 218).

Here, it is not disputed that all of the land used to create Timber Lane was dedicated as a public right of way by a single grantor who filed the Timber Lane plat. Timber Lane is located at the margin between two plats but since inception has been entirely within the Timber Lane Plat in Shorewood. Thus, there is no foundation to apply the center line presumption here. Accordingly, any presumption that the Ugorets own title to the center line of Timber Lane and derive a resulting right of access is rejected.

### 2. Property owners derive an easement right of access to abutting streets

The analysis does not end there, however. The center line presumption is not the

9

only source from which a landowner can derive a protectible right of access to an abutting public street. Four years before *Robbins* recognized the center line presumption, the Minnesota Supreme Court stated that "it is well settled that the owner of lots abutting on a public street, whether he owns the soil to the center of the street or not, has a special interest in the street different from that of the general public." *Brakken v. Minneapolis & St. L. R. Co.*, 11 N.W. 124, 125 (Minn. 1881); *see also Gustafson v. Hamm*, 57 N.W. 1054, 1055–56 (Minn. 1894) ("It is the settled doctrine of this court that the owner of a lot abutting on a public street has, as appurtenant to the lot, and independently of the ownership of the fee in the street, an easement in the street, to its full width, in front of his lot, for the purposes of access, light, and air, which constitutes property."); *Lamm v. Chicago, St. P., M. & O. Ry. Co.*, 47 N.W. 455, 459 (1890) ("[T]he abutting owner has, in the opposite half of the street, not the fee, but an easement for access, light, and air for the benefit of his premises."). Under Minnesota law, an owner of a property abutting on a public street possesses a property interest in the form of an easement for access, light, and air that reaches across to the other side of the abutting street, regardless of whether the owner also owns any of the land under the street.

Shorewood's arguments that the City possesses some greater authority to manage access to a platted public road do not alter the rule establishing an easement right. "It is settled law in Minnesota that, when a street is dedicated by plat, a city may choose its own time to occupy, open, and use the street." *Village of Medford v. Wilson*, 230 N.W.2d 458, 459 (Minn. 1975). That is, when a platted roadway is dedicated to a municipality, the municipality is not immediately required to open, develop, or maintain the street;

rather, the municipality holds authority over when and how to begin development and use of the street. *See Zimmer v. Pine Lake Twp.*, 991 N.W.2d 886, 888 (Minn. App. 2023) (collecting cases). Timber Lane was developed as a public street, and not a private, gated, or otherwise limited-access street. Shorewood cites no authority for it to retain *ongoing* authority to block access to a plat-dedicated right of way long after it has been developed into a public street.

Under settled Minnesota law, owners of property abutting a public street possess an easement to the opposite side of the street for access, air, and light, independent of who owns the land under the street. Therefore, the Ugorets have an easement right of access to Timber Lane as abutting landowners, independent of whether they own title to any of the real estate underneath it.

**B.      Shorewood's Installation of the Bollards Constitutes a Taking**

Depriving landowners of the right to access their land from an abutting street generally is a taking that requires compensation. *See Underwood v. Town Bd. of Empire*, 14 N.W.2d 459, 461 (Minn. 1944). The right to compensation does not depend on "the fact of or extent of the use of the road for access; the availability of the road for such use establishes the right." *Id.* at 462. "Like other property rights, the right of reasonable access can be infringed or 'taken' by the state, giving the property owner a constitutional right to compensation." *Johnson v. City of Plymouth*, 263 N.W.2d 603, 605–06 (Minn. 1978) (citations omitted).

Whether through regulation or by making physical changes to a roadway, government action constitutes a taking if it deprives a property owner of "reasonable or

reasonably convenient and suitable access." *See Universal Marine & RV, Inc. v. State ex rel. Molnau*, No. A05-757, 2006 WL 9612, at *3 (Minn. App. Jan. 3, 2006) (quoting *Johnson*, 263 N.W.2d at 605). Whether reasonable access exists depends on "the unique circumstances of each case, including the character of the property involved." *Id.* (citing *Johnson*, 263 N.W.2d at 607). Although the existence of reasonably convenient access has been called a fact question, "in inverse condemnation actions, whether a change in access constitutes a taking is determined as a matter of law." *Oliver*, 760 N.W.2d at 916 (citing *Chenoweth v. City of New Brighton*, 655 N.W.2d 821, 824 (Minn. App. 2003)).

At first glance, the taking analysis might seem simple: the Ugorets had vehicular access to their property from Timber Lane, Shorewood physically blocked it, and now the Ugorets are barred vehicular access. But such a simplistic analysis would not sufficiently consider the circumstances that are unique to this case.

Determining whether government action crosses the line into a violation of rights does not lend itself to standardized rules or a formulaic analysis—a lesson previous courts have long understood. *See, e.g.*, *State ex rel. Lachtman v. Houghton*, 158 N.W. 1017, 1019 (Minn. 1916) ("The dividing line between restrictions which may be lawfully imposed under the police power and those which invade the rights secured to the property owner . . . has never been distinctly marked out, and probably cannot be. As different cases arise, the courts determine from the facts and circumstances of the particular case whether it falls upon one side or the other of the line."); *Kaje v. Chicago, St. P., M. & O. R. Co.*, 59 N.W. 493, 493 (1894) ("No general rule can be laid down which can be readily applied to every case. Where to draw the line between cases where the injury is more

general or more equally distributed and cases where it is not . . . is often a difficult task.").

The particular circumstances present and bearing on the taking analysis here fall into three categories: (1) the nature of the Ugorets property in relation to the access that was blocked; (2) the remaining property access without vehicular access from Timber Lane; and (3) Shorewood's claim that the bollards were placed for a valid public purpose.[2] Each consideration will be addressed in order.

### 1.     Nature of the property

Perhaps the most analogous property right akin to the circumstances here is an urban residential property with a public street in the front and an alley in the back. Although there are dissimilarities—an alley generally provides access to multiple residences, for example—what is relatable is that removing the back alley is especially impactful to that property:

> To say that the abutting owner is not specially damaged by obstructing access to his lot in the rear when he has access to it by a street in the front is much the same as saying that he is not damaged by obstructing the back door to his house when he has a front door. The rear entrance to the lot is generally used for different purposes from the front entrance. Besides, a public alley is generally used more by the abutting owners, and less by the public, than an ordinary street. As held in *Aldrich v. Wetmore*, 53 N.W. 1072 (Minn. 1893), it is not necessary that access to the street be wholly and completely cut off to cause the abutting owner special damage.

---

[2]     Shorewood also argues that Tonka Bay has already "taken" the Ugorets' Timber Lane access through a city ordinance that limits single family dwellings to one driveway per property. (*See* Doc. No. 40 at 11–12.) The question of whether Tonka Bay's driveway ordinance (which Tonka Bay has not enforced against the Ugorets) constitutes a taking is not at issue in this case, and it is unclear how Shorewood has standing to raise it. Even so, enforcement of that ordinance would not equate to placing a physical barrier blocking all vehicular access to the Ugorets property off of Timber Lane. Tonka Bay prohibits using a second access "principally" for vehicular access and does not block all vehicular access as Shorewood has done.

*Kaje*, 59 N.W. at 493. Effectively removing the rear access to the Ugorets property is no small matter; it altered a defining feature that was both unique and useful. The dual access is integral to the property's character and, in turn, its value, which the Ugorets capitalized on by building an underground backyard garage used for overwintering boats and vehicles that is only accessible from the rear access.

Dual access is also useful for providing emergency responders two ways to reach distinct parts of the property. With the bollards in place, responders no longer have the option to get a vehicle to the Ugorets' back yard from Timber Lane; they must now either walk from Timber Lane or navigate a vehicle between homes and down an elevation change from the front yard to the back yard. Sections at the back of the house or rear garage may be entirely inaccessible for emergency or rescue vehicles. Reducing access options for first responders or those providing other services diminishes the nature of the property's utility and safety.

This consideration favors finding a taking.

### 2. Reasonable remaining access

The next consideration is whether the Ugorets are left with reasonable access to their property in the front without the rear Timber Lane access. The reasonable access consideration turns on the landowner's intended use and focuses on "[t]he convenience and suitability of ingress and egress . . . between the abutting road and the parcel's perimeter." *See Matter of Kuk*, 2022 WL 4682932, at *3 (quoting *Oliver*, 760 N.W.2d at 917). Depending on the circumstances, it is possible that even "substantial

14

inconvenience" might *not* constitute a denial of reasonable access. *See Johnson*, 263 N.W.2d at 607.

Viewing the record in a light favorable to Shorewood, the bollards preclude vehicular access from the rear of the property entirely. This is not a matter of simple physical inconvenience. The Ugorets claim that they can no longer have contractors use the Timber Lane access for large equipment or to deliver project materials. Access from the front is much more challenging, time consuming, costly, and in some instances, impossible (as is the case for the rear garage, which is inaccessible from the front of the house). The challenges for emergency responders were previously addressed. The Ugorets do not have a mere preference to use the Timber Lane access; their intended use and enjoyment of their property either significantly benefits from or requires the Timber Lane access point.

This consideration also favors finding a taking.

### 3.    Proper public improvement

The final circumstance for consideration is whether Shorewood's stated justifications for blocking the access constitute a proper public use or improvement of Timber Lane. A city government is permitted to exercise its police powers to improve public streets in the interest of public safety and welfare. *Johnson*, 263 N.W.2d at 606. However, it becomes a taking if it has the effect of denying abutting property owners the right of reasonable access to their property. *See id.*; *see also State ex rel. Lachtman v. Houghton*, 158 N.W. 1017, 1021 (Minn. 1916) ("[W]hen the legislative power attempts to forbid the owner from making a use of his property which is not harmful to the public

15

and does not interfere with the rightful use and enjoyment of their own property by others, it invades property rights secured to the owner by both the state and federal Constitutions.").

This consideration starts with reviewing the public entity's proffered justifications for its actions. *Cf. Kelo v. City of New London, Conn.*, 545 U.S. 469, 478 (2005) (stating that city government would not be permitted to take property via condemnation "under the mere pretext of a public purpose"); *Franco v. Nat'l Cap. Revitalization Corp.*, 930 A.2d 160, 169 (D.C. 2007) ("The government will rarely acknowledge that it is acting for a forbidden reason, so a property owner must in some circumstances be allowed to allege and to demonstrate that the stated public purpose for the condemnation is pretextual.").

Shorewood offered various justifications for placing the bollards—namely preserving parking space, regulating traffic, and maintaining emergency accessibility on Timber Lane. Even viewing the justifications in a light most favorable to Shorewood, the justifications lack rational factual support. For example, it is not obvious and not explained in the record how placing obstructive bollards off the pavement and in the grassy area of the Timber Lane right of way facilitates parking, or how blocking a single, infrequently used access to private property regulates traffic in a cul-de-sac. If anything, the bollards *reduce* the available parking space and potentially require vehicles to park *further* into the street than before. This potential for less road space also cuts against maintaining emergency vehicle access—not only for the Shorewood residents but also for the Ugorets, should the need arise for an emergency response to a fire, health, or other incident addressable from the rear of their property.

16

Additionally, the evidence reveals that City staff were first directed to develop an "aggressive plan" to halt the access by the Ugorets, without any mention of a public improvement rationale. (Doc. No. 46-7 at 59; *see also* Doc. No. 41-1 at 241.) Shorewood points to no other evidence in the record justifying the bollard-blocking as part of a wider public safety initiative.

Finally, Shorewood analogizes the bollards to telephone lines next to a public street or sound barriers next to an interstate highway, both of which have been found to be valid public improvements. (*See* Doc. No. 67 at 1, 4–5.) The paramount public need for communications justifies the telephone lines, and the sound barriers have an obvious purpose of dampening the unavoidable noise caused by vehicles driving on the interstate (to the benefit of the abutting landowners). *See Cater v. Nw. Tel. Exch. Co.*, 63 N.W. 111, 114 (Minn. 1895); *Haeussler v. Braun*, 314 N.W.2d 4, 9 (Minn. 1981). Shorewood's analogies beg the question. No similar overriding public improvement need is obvious here, and it is not apparent how the bollards meaningfully address effects from traffic on Timber Lane.

The public purposes that may have legitimized the bollards as improvements to Timber Lane are not sufficiently present here, where the purported "improvement" only amounts to interference with one family's access to their private property.

This consideration favors finding a taking.

### 4.   Conclusion

Considering the totality of circumstances, Shorewood's placement of bollards obstructing vehicular access to the Ugorets property amounts to a taking of their right to

access Timber Lane.

### C.     Remedies

Having found that the Ugorets possess a right of access to Timber Lane, and that Shorewood's actions took away that right, the analysis next addresses whether the Ugorets are entitled to a remedy, either in the form of money damages or an injunction.

### 1.     Fact issues preclude summary judgment on money damages

Regarding money damages, both sides contend that the undisputed facts warrant summary judgment in their favor. The Ugorets argue that their damages expert conclusively establishes the expected costs they must incur as a result of the lost access, in the form of storage fees, increased home improvement project fees, and other additional costs for uses made less accessible without the backyard access. (*See* Doc. No. 45 at 13; Doc. No. 46-2 at 2, 10.) Shorewood, on the other hand, contends that any lost value or increased costs are far outweighed by the property's $345,000 increase in assessed value from 2021 to 2022. (Doc. No. 41-1 at 140.) Material factual disputes preclude summary judgment for either side.

The proper measure of damages in a partial-takings case is the fair market value of the property before and after the alleged taking. *See United States v. 9.20 Acres of Land*, 638 F.2d 1123, 1126–27 (8th Cir. 1981) (collecting cases). While Shorewood appears correct that increased costs for unique property uses cannot be independently *recovered*, it does not establish that evidence of those increased costs cannot be *considered* by a jury solely for its potential effect on fair market value. The fact finder is allowed to consider all factors of value that would affect the market value of the property. *See United States*

*v. 91.90 Acres of Land*, 586 F.2d 79, 86–87 (8th Cir. 1978).

On the record here, a reasonable jury could consider *both* evidence of the property's fair market value before and after the taking *and* evidence of increased use costs and determine that the Ugorets do not enjoy the full increase in their property's fair market value (because their out-of-pocket costs have increased). Or the jury could consider that evidence and determine that the increased value simply exceeds the claimed increased costs and award nothing. That is a material fact issue that precludes summary judgment on damages.[3]

### 2.      Injunctive relief

In an earlier motion to dismiss order, Judge Tunheim precluded the Ugorets' § 1983 claim for injunctive relief, finding "no indication that money damages would not be sufficient to remedy the potential harm here." (Doc. No. 28 at 7–8.) This Court has since had the benefit of reviewing a fully developed factual record and the parties' subsequent extensive briefing.

A defendant that violates an individual's constitutional rights while acting under color of law "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. Indeed, equitable relief is ordinarily not available if another adequate remedy is available to a Fifth Amendment claimant, such as a state's inverse condemnation cause of action. *See Knick v. Twp. of*

---

[3]      Because the Court awards the Ugorets their requested injunctive relief, any question on money damages that proceeds to trial will be limited to alleged damages incurred during the period that the bollards were in place.

*Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019). But the rule is not ironclad. *See Pharmaceutical Research and Manufacturers of America v. Williams*, 64 F.4th 932, 941– 42 (8th Cir. 2023) (recognizing that "*Knick* does not hold that *every* state's compensation remedy is adequate in a particular situation" and examining the adequacy of Minnesota inverse condemnation remedy for standing purposes).

The Supreme Court has long held that "a suit in equity does not lie where there is a plain adequate and complete remedy at law . . . . But the legal remedy must be as complete, practical[,] and efficient as that which equity could afford." *Id.* at 942 (quoting *Terrace v. Thompson*, 263 U.S. 197, 214 (1923). Whether that rule applies depends on the circumstances of each case. *See id.* (quoting *United States v. Union Pac. Ry. Co.*, 160 U.S. 1, 51 (1895)).

Issuing equitable relief requires more than a "theoretical inadequacy" of the legal remedy. *Id.* (quoting *Equitable Life Assur. Soc. of U.S. v. Wert*, 102 F.2d 10, 15 (8th Cir. 1939)). The record must show a sufficient "practical inadequacy" in the legal remedy, such that the plaintiff's rights will be substantially and adversely affected if equitable relief is not granted. *Id.* (quoting *Equitable Life*, 102 F.2d at 15). Put differently, equitable relief is barred only if the legal relief is "so complete that it attains the full end and justice of the case, reaching the whole mischief and securing the whole right of the party in a perfect manner at the present time and in the future." *Id.* (quotation omitted).

Based on the summary judgment record, money damages do not constitute a complete, practical, and efficient remedy for the Ugorets here.

Because the Ugorets used the Timber Lane access only occasionally and for

specific uses, the bollards blocking that access impose what the Minnesota Supreme Court calls a "constantly recurring grievance." *Gustafson v. Hamm*, 57 N.W. 1054, 1056 (Minn. 1894) ("The legal right being clear, and the trespass or nuisance, whichever it be, being a continuing one, he is not confined to successive actions for damages, but may maintain an action to enjoin the constantly recurring grievance; and, where a clear legal right is thus violated, the fact that the actual damages, if substantial, are comparatively small, is not important.").

So long as the bollards are in the way, the harm recurs each time the Ugorets wish to use the access but cannot. In addition, the nature of each recurring injury varies depending on the desired usage of the access and the burdensomeness of alternative solutions. The nature, extent, and amount of each harm changes depending on precisely how, when, and why the Ugorets need access. Such a variable and forward-looking injury is not amenable to present specific identification or compensability. Therefore, while Minnesota state law generally provides a monetary remedy through an inverse condemnation cause of action, the circumstances render that remedy inadequate here to address the valuation of future harms, though such future harms are inevitable.

Accordingly, the Ugorets are not precluded from seeking or receiving the injunctive relief they claim in their Complaint. (*See* Doc. No. 1 at 6.) Because the Ugorets possess the right to access Timber Lane from their abutting property, and because Shorewood's placement of bollards interfering with that right of access amounts to an unconstitutional taking, the Ugorets are entitled to injunctive relief.

**ORDER**

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 38) is **DENIED** in its entirety, and Plaintiffs' Motion for Summary Judgment (Doc. No. 43) is **GRANTED** as to the existence and taking of a property right and **DENIED** as to money damages. As explained above, the question of money damages is left for trial.

**IT IS HEREBY FURTHER ORDERED** that Defendant must remove the bollards obstructing the Ugorets property's access to Timber Lane within twenty days of this Order. Any future interference with the Ugorets property's access to Timber Lane must comply with the letter and spirit of this Order as well as all federal, state, and local laws.

Date: September 29, 2023                         _s/ Jerry W. Blackwell_
                                                 JERRY W. BLACKWELL
                                                 United States District Judge

22